LEONARD INVESTMENT COMPANY, PROSECUTOR, v. THE BOARD OF ADJUSTMENT OF THE CITY OF TRENTON ET AL., DEFENDANTS.

Submitted October 4, 1938—Decided March 15, 1939.

Before BROGAN, CHIEF JUSTICE, and Justices BODINE and HEHER.

For the prosecutor, *Walscheid & Rosenkranz* (*J. Emil Walscheid,* of counsel).

For the defendants, *Sidney Goldmann.*

The opinion of the court was delivered by

HEHER, J. This *certiorari* brings up for review the action of the Board of Adjustment of the city of Trenton in revoking a permit, issued by the municipal building inspector on March 15th, 1938, for the erection of a one-story brick building, to be used for store purposes, on lands of prosecutor—one hundred and seventy-five feet by one hundred feet—situate on the easterly side of Chambers Street, between Tioga Street and Euclid Avenue, in the City of Trenton.

The local zoning ordinance then in force, adopted on July 8th, 1927, placed the lands on either side of Chambers street, at the point in question, to a depth of one hundred feet, in a "No. 1 Business Zone," as defined therein. The surrounding territory is largely residential. Immediately upon learning, after the grant of the permit, that the design of prosecutor was to devote the proposed building to the conduct of a self-service food market, employing approximately fifty people, neighboring property owners appealed the action thus taken by the building inspector to the board of adjustment. And that body, after hearing, ruled that the zoning ordinance established "minimum requirements * * * for the promotion of the public health, safety, comfort, convenience and general welfare;" that a duty rested upon it, in a case such as this, to "interpret and apply the provisions of the ordinance so that its general purposes and intent may be realized and substantial justice done;" that the specification of prohibited uses in business zones, contained in section III of the ordinance, "must be read in the light of the general purposes and intent of the ordinance, that is to lessen congestion in the streets, to promote health, morals and the general welfare, to secure safety from fire and other dangers;" that, while "not specifically prohibited as a use under section 3 of the ordinance, the food market" to be erected "comes within that class of trades and uses which section 3 excludes from business zones," notably "certain businesses employing more than four (4) persons * * *, garages for more than five (5) motor vehicles and motor vehicle service stations—both being trades inimical to the public health, safety and welfare," and

"certain amusement businesses which invariably attract crowds;" that the proposed market "is intended to attract a large clientele," and "is to be erected in a neighborhood devoted to residences of the better type," at a distance of approximately two hundred and fifty feet from the Central High School, "where over three thousand children attend classes daily," and "a short block away" from "the fifth most dangerous corner, in point of view of accidents, in the city;" that nine hundred and seventy-five cars pass that intersection per hour, four hundred and fifty-five of which pass the site of the food market, and that the devotion of the property to such use will substantially increase traffic hazards, and also "unfavorably affect the entire neighborhood and those who dwell in it," and decrease the "valuation" of neighborhood properties; and that the proposed use "will not promote the public health, safety, comfort, convenience and general welfare, but will definitely impair them," and therefore the building inspector "erred in issuing the permit in question."

The primary question therefore is whether the Board of Adjustment was invested with the authority thus exercised. Prosecutor maintains the negative of this proposition, while defendants insist that it is derived from section IX of the ordinance, conferring upon the board power, "in a specific case, after public notice and hearing, and subject to appropriate conditions and safeguards," to "determine and vary the application of the regulations" therein "established in harmony with their general purpose and intent, without changing the boundaries of the respective zones, as follows: * * * 6. Vary any requirement" of the ordinance "in harmony with its general purposes and intent, so that substantial justice may be done;" and also from section XIV of the ordinance, providing that "in their interpretation and application the provisions" of the ordinance "shall be held to be the minimum requirements adopted for the promotion of the public health, safety, comfort, convenience and general welfare." The latter provision in particular was invoked by the board as conferring the power exercised.

We are of the view that the action thus taken by the board was *coram non judice*.

The ordinance established the zones; and it is provided by section I that "No building or premises shall be erected, altered or used for any other than a purpose permitted in the zone in which such building shall be erected except in conformity with the regulations herein prescribed for the zone in which such building is located." Section II enumerates the buildings and uses permissible in residence zones. Section III specifies the uses prohibited in business zones. Viewing subdivision 19 thereof in relation to the whole, it plainly evinces an intention to permit the use of premises in such zones for retail store purposes. The character of the detailed prohibitions is clearly indicative of this design. A retail food market, such as that proposed in the instant case, falls into this category. There is revealed no purpose to make such use of premises in a business zone dependent upon either the size of the establishment, the volume of business, or the number of employes. The residential character of the surrounding territory is beside the point. After all, the lands are in an area zoned for business, with certain definite exceptions not embracive of the use under consideration; and there must be uniformity of application. Arbitrary distinctions are inadmissible.

Section IX (a-6), *supra,* does not confer the claimed authority. It merely vests in the board power to "vary any requirement" of the ordinance "in harmony with its general purposes and intent, so that substantial justice may be done." This does not embrace the broadening of the restrictions laid down in the ordinance. It is expressly provided that "this authority shall be exercised solely in instances where there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter" of the ordinance, and "in a manner to secure the public health, safety and general welfare." And the associated specifications of power in this section reveal a design to authorize a variance from the requirements of the ordinance in certain cases, not to vest in the board power to enlarge its inhibitions. *Lutz* v. *Kallenbach,* 102 *N. J. L.* 718; *Losick* v. *Binda,* 102 *Id.* 157.

Nor is the authority exercised comprehended by section XIV of the ordinance. It simply provides that, in the inter-

pretation and application of the regulations therein prescribed, they "shall be held to be the minimum requirements adopted for the promotion of the public health, safety, comfort, convenience and general welfare." Viewed in the light of the explanatory statement of intention embodied in that section, the manifest design was to make clear that, in the interpretation of the ordinance, such regulations were to be regarded as minimum requirements only, and not as an impairment of the greater requirements imposed by "existing provisions of the law or ordinance," or "rules, regulations or permits previously adopted or issued, or which shall be adopted or issued pursuant to law, relating to the use of buildings or premises," or "any easements, covenants or other agreements between parties."

Chapter 274 of the laws of 1928 (incorporated in the Revised Statutes of 1937 as sections 40:55-30, *et seq.*), adopted pursuant to the zoning amendment of the State Constitution ratified on October 18th, 1927, delimited the essential powers of the local Board of Adjustment in language substantially like that contained in the zoning statute of 1924 (*Pamph. L., p.* 324), and provided that all existing zoning ordinances should "remain in full force and effect, except in so far as they were inconsistent with the provisions" of the act, "until they shall have been amended, or repealed by the governing body or board of public works." And this is what our court of last resort has said respecting the scope of these provisions: "This court, in *H. Krumgold & Sons* v. *Jersey City, ante, p.* 170, held: 'Where a zoning ordinance is ineffective to deprive an owner of property of his right to use the same for store purposes, no appeal to a board of appeals constituted under said ordinance is necessary as a prerequisite for an application for a writ of *mandamus.*' And in *Losick* v. *Binda, ante, p.* 157, we further held that boards, such as boards of adjustment, are created for, and have jurisdiction, only for the purpose of dealing with properties peculiarly situated with reference to zoning requirements and to provide for equitable modifications where it is apparent unnecessary hardship would result to the owner if the provisions of the ordinance were literally enforced, as in *Allen*

v. *Paterson*, 98 *N. J. L.* 661; *affirmed*, 99 *Id.* 532, and have no authority or jurisdiction to act as an appellate body for the purpose of reviewing the legal or equitable character of the building inspector's act in allowing or rejecting an application for a building permit, nor to pass upon the question as to whether the provisions of the zoning ordinance are in furtherance of the proper exercise of the police power of the municipality." *Lutz* v. *Kaltenbach, supra.*

The resolution of revocation adopted by the Board of Adjustment is therefore vacated, but without costs.